IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                    No. CR 07-1560 JB

BENJAMIN YOUNGBEAR,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Sentencing Memorandum, filed April 14, 2008 (Doc. 37)("Sentencing Memo."); and (ii) the Defendant's Objection to the Presentence Report, filed April 17, 2008 (Doc. 38)("Objection"). The Court held a sentencing hearing on April 22, 2008. The primary issues are: (i) whether the Court should excise any mention of Defendant Benjamin Youngbear using a knife in the fight described in paragraph 40 of the Presentence Investigation Report ("PSR"); (ii) whether the Court should vary from the 18-month advisory guideline sentence and impose a sentence of 12 months and one day; (iii) whether the Court should require Youngbear to undergo alcohol treatment; and (iv) whether the Court should recommend that the Bureau of Prisons incarcerate Youngbear in Sheridan, Oregon. The Court will overrule Youngbear's objection to paragraph 40 of the PSR as moot, because the Addendum includes Youngbear's version of events at the fight. The Court will grant Youngbear's other requests. The Court may also set a hearing on the amount of restitution and to whom the restitution should be paid within 90 days of April 22, 2008, because the restitution was not ascertainable at the time of the April 22, 2008 sentencing hearing.

## FACTUAL BACKGROUND

Paragraphs 46 through 49 of the PSR, under the section titled "Personal and Family Data," show that Youngbear had a very difficult and tragic childhood. Paragraph 46 states:

> Benjamin Jacob Youngbear reported he was born on October 5, 1986, on the Crow Agency Indian Reservation in Billings, Montana. Mr. Youngbear indicated he is one of three children born to Everett Youngbear, deceased; and Joanne Youngbear, deceased. The defendant stated his father passed away in 1999 from walking pneumonia, and his mother passed away in 1994, due to food poisoning. Benjamin Youngbear indicated after his father passed away in 1999, he and his two siblings were sent to reside with their maternal grandmother, Juanita Cata, age 74, on the San Juan Pueblo, in Rio Arriba County, New Mexico. The defendant stated his grandmother is retired from the Los Alamos, New Mexico Laboratories. Benjamin Youngbear reported he has two sisters, Yvette Youngbear, age 29; and Nicole Edmond, age 24. It should be noted, Yvette Youngbear is the victim in the instant offense. The defendant indicated he has not had any contact with Yvette since the instant offense occurred. Mr. Youngbear indicated he believes Yvette is a "party person" and therefore, she stays away from home for long periods of time, and does not maintain contact with the family. Mr. Youngbear indicated Nicole resides in San Juan Pueblo with her immediate family.

PSR ¶ 46, at 17. Although paragraph 47 of the PSR indicates that Youngbear reported experiencing a normal childhood before his mother died, a review of the information indicates he did not have a normal childhood thereafter.

> Benjamin Youngbear reported he experienced a normal childhood up until his mother passed away in 1994. Mr. Youngbear indicated after his mother passed away, his father began to heavily drink alcohol, and therefore, he and his sisters were left alone on their own on many occasions. Mr. Youngbear indicated due to his father[']s alcoholism, he was sent to live with a foster family in Montana when he was approximately eleven years old. The defendant indicated he only lived with the foster family for approximately six months, until his father passed away. Mr. Youngbear stated he then was sent to New Mexico to reside with his grandmother, Juanita Cata. Mr. Youngbear reported he maintains a good relationship with his grandmother and sister, Nicole.

PSR ¶ 47, at 17. Youngbear is fortunate to have extended family who were willing to assist in his upbringing; however, it is questionable how much supervision his grandmother provided during

Youngbear's adolescence and teenage years.

> Paragraph 48 of the PSR states:
>
> Mr. Youngbear reported aside from his father having problems with alcohol, his sister Yvette, also has substance use and abuse problems. The defendant indicated there was no physical or mental abuse in the family home. Mr. Youngbear also noted he experienced a normal childhood when he resided with the foster family. The defendant reported his grandmother and sisters are in good physical health, and they are aware of his current legal situation. Mr. Youngbear indicated since he has been incarcerated, he writes letters to his grandmother on a weekly basis.

PSR ¶ 48, at 18. Paragraph 49 states:

> Benjamin Youngbear reported from birth until 1999, he resided on the Lane Deer Reservation in Montana with his biological family. From 1999 until the instant offense occurred, Mr. Youngbear indicated he had been residing on the San Juan Pueblo in Rio Arriba County, New Mexico with his grandmother and two uncles, Mark and Jake Cata. It should be noted, Mr. Youngbear was arrested on June 19, 2007, and was released to the La Pasada Halfway House in Albuquerque, New Mexico and resided there until October 11, 2007. Mr. Youngbear is currently in custody at the Sandoval County Detention Center in Bernalillo, New Mexico.

PSR ¶ 49, at 18.

Youngbear thus lost his mother at the age of seven and remained with his father until his father passed away when Youngbear was twelve years old. Part of his childhood was spent in the care of a foster family. This time with a foster family was because Youngbear's father suffered from alcoholism.

It appears that all of Youngbear's past contact with law enforcement is related to alcohol. For example, paragraph 40 of the PSR states:

| | | | | |
|---|---|---|---|---|
| 01/27/07 (Age 20) | Count 2: Battery (Misdemeanor), Ohkay Owingeh Tribal Court, Rio Arriba County, New Mexico, Case No. CR 2007-0004 | 03/07/07: Pled guilty sentenced to 90 days jail with 33 days credit time served, participate in anger management/domestic violence prevention | 4A1.2(i) | 0 |

-3-

>                             and AA meetings,
>                             pay $300 fine;
>                             05/02/07: Released
>                             from custody

> The defendant waived his right to an attorney. Count One, Assault was dismissed by the Court. According to a Statement of Probable Cause prepared by the San Juan Tribal Police Department, on January 27, 2007, officers were dispatched to a residence in reference to a stabbing. Upon arrival of the officers, they made contact with the victim's girlfriend, Ella Arguino. Ms. Arguino stated she returned home from work and found her boyfriend, identified as Joe Martinez laying on the couch and was bleeding from his mouth. Ms. Arguino then indicated she saw that Mr. Martinez had a gang sign of XIV carved on his stomach. The officer spoke to Mr. Martinez about what had occurred, and he observed Mr. Martinez to be rather intoxicated. Mr. Martinez stated while he was sleeping, Benjamin Youngbear "jumped" him and started stabbing him. Mr. Martinez indicated he tried to fight him off, however, he was unable to. Mr. Martinez stated the defendant then stabbed him in the mouth, penetrating through his lip. Mr. Martinez stated the defendant then carved a gang sign on his stomach. Mr. Martinez stated the defendant then left his residence, and that he could possibly be at Benjamin's girlfriend's residence.

> The officers proceeded to the address given by Mr. Martinez, and made contact with a Peter Chavez. The officers asked Mr. Chavez if his daughter, Martina, was home, to which he indicated she was in her room. Officers went to Martina's room and found Martina and Benjamin in bed together. The officers advised Mr. Youngbear to get up from the bed, and that he was under arrest for assault and battery on Joe Martinez. The officer noticed Mr. Youngbear had a laceration on his chest and asked him how he got it. Mr. Youngbear indicated Mr. Martinez stabbed him with a steak knife. Mr. Youngbear was handcuffed and placed under arrest.

> Mr. Youngbear was taken to the Ohkay Owingeh Police Department for further questioning. Mr. Youngbear advised the officer that Joe and he had been drinking at Joe's residence when Joe started to get abusive and called the defendant names. The defendant stated he got upset and pushed Joe. Joe then went into the kitchen and got a steak knife and started swinging it at Benjamin. Benjamin stated Joe struck him in the chest with the knife. The defendant also indicated he sustained defensive stab wounds on his left arm. Mr. Youngbear then stated he was able to punch Joe in the face and knock him out. Benjamin stated he then got the knife from Joe and stabbed him in the mouth and carved "XIV" on his stomach. Mr. Youngbear indicated he did this to Joe because he was mad at him for calling him names. The defendant was then booked into the Santa Fe Detention Center on the listed charges.

PSR ¶ 40, at 13-14.

and AA meetings,
                                    pay $300 fine;
                                    05/02/07: Released
                                    from custody

> The defendant waived his right to an attorney. Count One, Assault was dismissed by the Court. According to a Statement of Probable Cause prepared by the San Juan Tribal Police Department, on January 27, 2007, officers were dispatched to a residence in reference to a stabbing. Upon arrival of the officers, they made contact with the victim's girlfriend, Ella Arguino. Ms. Arguino stated she returned home from work and found her boyfriend, identified as Joe Martinez laying on the couch and was bleeding from his mouth. Ms. Arguino then indicated she saw that Mr. Martinez had a gang sign of XIV carved on his stomach. The officer spoke to Mr. Martinez about what had occurred, and he observed Mr. Martinez to be rather intoxicated. Mr. Martinez stated while he was sleeping, Benjamin Youngbear "jumped" him and started stabbing him. Mr. Martinez indicated he tried to fight him off, however, he was unable to. Mr. Martinez stated the defendant then stabbed him in the mouth, penetrating through his lip. Mr. Martinez stated the defendant then carved a gang sign on his stomach. Mr. Martinez stated the defendant then left his residence, and that he could possibly be at Benjamin's girlfriend's residence.
>
> The officers proceeded to the address given by Mr. Martinez, and made contact with a Peter Chavez. The officers asked Mr. Chavez if his daughter, Martina, was home, to which he indicated she was in her room. Officers went to Martina's room and found Martina and Benjamin in bed together. The officers advised Mr. Youngbear to get up from the bed, and that he was under arrest for assault and battery on Joe Martinez. The officer noticed Mr. Youngbear had a laceration on his chest and asked him how he got it. Mr. Youngbear indicated Mr. Martinez stabbed him with a steak knife. Mr. Youngbear was handcuffed and placed under arrest.
>
> Mr. Youngbear was taken to the Ohkay Owingeh Police Department for further questioning. Mr. Youngbear advised the officer that Joe and he had been drinking at Joe's residence when Joe started to get abusive and called the defendant names. The defendant stated he got upset and pushed Joe. Joe then went into the kitchen and got a steak knife and started swinging it at Benjamin. Benjamin stated Joe struck him in the chest with the knife. The defendant also indicated he sustained defensive stab wounds on his left arm. Mr. Youngbear then stated he was able to punch Joe in the face and knock him out. Benjamin stated he then got the knife from Joe and stabbed him in the mouth and carved "XIV" on his stomach. Mr. Youngbear indicated he did this to Joe because he was mad at him for calling him names. The defendant was then booked into the Santa Fe Detention Center on the listed charges.

PSR ¶ 40, at 13-14.

## PROCEDURAL BACKGROUND

Based on his plea, and pursuant to the assimilated crimes act and N.M.S.A. 1978, § 30-3-2, Youngbear faces a maximum sentence of 18 months. See 18 U.S.C. § 1153 and 13; N.M.S.A. 1978, § 30-3-2. Youngbear argues that, pursuant to N.M.S.A. 1978, § 30-3-2, the sentence can be mitigated by one third. See Sentencing Memo. ¶ 1, at 1. In the plea agreement, at paragraph 7b, the United States has stipulated that the appropriate sentence may be at the low end of the statutory range after a reduction of one third of the base offense level as allowed for by the statute. See Plea Agreement ¶ 7b, at 4, filed February 4, 2008 (Doc. 35).

In paragraph 55 of the PSR, Youngbear expresses concern regarding his own developing problem with alcohol. See PSR ¶ 55, at 19. In his written statement, Youngbear states:

> I would like to ask the Court to provide some help for my problem with alcohol. The only time I ever get myself into trouble is when I am drinking and I know I need to quit. I would ask for counseling as part of my conditions following my release from custody. If I can stay way from alcohol, I will be able to stay out of trouble.

Id.

In paragraphs 84 and 85, in the section titled "Factors that May Warrant Departure," the PSR states:

> 84. After assessing the defendant's criminal and social history and details of the instant offense, it is determined he does not appear to have any circumstances that would take his case away from the heartland of cases of similarly situated defendants. Therefore, the probation office has identified no departure issues. Pursuant to the Plea Agreement, the defendant agrees not to seek a downward departure or variance, as the Plea Agreement has already conferred a benefit upon him.
>
> 85. Pursuant to U.S.S.G. 4A1.3, the Court may consider the defendant's criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes. The defendant is presently at a criminal history category of I. However, he has four prior adult convictions that were not countable toward his criminal history score. Pursuant

to 4A1.2(i), sentences resulting from tribal court convictions are not counted, but may be considered under 4A1.3 (Adequacy of Criminal History Category). Among the defendant's four tribal court convictions, all convictions involved Domestic Violence and/or Assault and Battery. Had they not occurred in tribal court, these convictions would have been countable toward the defendant's criminal history score. If these convictions would have been countable, the defendant would have had a total of six criminal history points, as he would have also been assessed two criminal history points for committing the instant offense less than two years after release from imprisonment, which would have placed him in a criminal history category of III. Although, the Court can consider an upward departure based on under-representation of criminal history, the instant offense is under the Assimilative Crimes Act, and therefore, the penalty cannot exceed 18 months imprisonment, which would make any upward departure moot.

PSR ¶¶ 84, 85, at 25-26.

Youngbear submits a sentencing memorandum pursuant to 18 U.S.C. § 3553(a). See Sentencing Memo. at 1. Based on the stipulation, Youngbear requests that the Court impose a sentence of 12 months and one day. See id. ¶ 1, at 1. Youngbear also requests alcohol treatment and that the Court recommend that he serve his sentence at the FCI in Sheridan, Oregon. See id. ¶¶ 4, 5, at 2. In his objection, Youngbear submits an objection to paragraph 40 of the PSR and requests that the Court sentence Youngbear in accordance with the request in his sentencing memorandum. See Objection ¶¶ 1-3, at 1-2.

The United States has not submitted objections to the PSR. On April 18, 2008, the United States Probation Office ("USPO") disclosed an Addendum to the PSR. See Addendum to the Presentence Report (dated April 18, 2008)("Addendum"). The USPO recognized Youngbear's objection and included his version of the events described in paragraph 40 of the PSR: "Mr. Youngbear was the initial victim in that situation and had been stabbed by Mr. Martinez who initially brought a knife into the fight. Mr. Youngbear then struck Mr. Martinez in self-defense and was able to disarm Mr. Martinez, however, Mr. Youngbear never touched Mr. Martinez with a

knife." Addendum at 1. The USPO incorporated Youngbear's version by way of the Addendum. See id. The USPO noted that it derived the information contained in paragraph 40 of the PSR from court records and police records from the Okay Owingeh Tribal Court and the San Juan Tribal Police Department. See id. The USPO attached copies of those documents to the Addendum. See id. at 3-5.

At the April 22, 2008 hearing, Youngbear stated that he believed his objection to paragraph 40 of the PSR had been made moot by the USPO's Addendum. See Transcript of Hearing at 3:8-12 (taken April 22, 2008)("Tr.")(Court & Keefe).[1] Youngbear asked the Court to delay making a final ruling on restitution until he is provided with more information. See id. at 4:20-22 (Keefe). Youngbear noted that he had not previously asked for more information regarding restitution, but argued that there was a lack of clarity regarding restitution. See id. at 4:23-25 (Keefe). The Probation Officer stated that the amount of restitution was not ascertainable at the time of the April 22, 2008 hearing. See id. at 8:2-4 (Court & Probation Officer). The United States agreed with the Probation Officer. See id. at 8:5-6 (Court & Torrez).

## LAW REGARDING SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States severed the mandatory provisions from the Federal Sentencing Act, thus making the Guidelines effectively advisory. While excising two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

-7-

factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D). See 18 U.S.C. § 3551 ("[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case."). To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to be considered. See Rita v. United States, 127 S. Ct. 2456, 2464 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many

others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"). They are significant because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotations omitted). A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006). This presumption, however, is an appellate presumption, not one that the trial court can or should apply. See ; Gall v. United States, 128 S.Ct. 586, 591 (2007); Kimbrough v. United States, 128 S.Ct. 558, 564 (2007); Rita v. United States, 127 S. Ct. at 2463. Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory Guideline sentence. See Gall v. United States, 128 S.Ct. at 591 (2007); Kimbrough v. United States, 128 S.Ct. at 564; Rita v. United States, 127 S. Ct. at 2463.

### LAW REGARDING RESTITUTION

The Mandatory Victim Restitution Act provides that a sentencing court will enter a restitution order for each defendant who has been found to have committed a crime of violence, an offense against property, or a crime related to tampering with consumer products. See 18 U.S.C. § 3663A(c)(1)(A)(ii); United States v. Dazey, 242 Fed.Appx. 563, 574 (10th Cir. 2007). 18 U.S.C.

§ 3664 provides, in relevant part:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

18 U.S.C. § 3664. "'In a restitution order, the district court shall order restitution to each victim in the full amount of each victim's losses as determined by the court without consideration of the economic circumstances of the defendant.'" United States v. Albert, No. CR06-2384 JB, Order at 12, filed February 29, 2008 (Doc. 36)(D.N.M.)(Browning, J.)(quoting United States v. Galloway, 509 F.3d 1246, 1253 (10th Cir. 2007)). The United States bears the burden of proving the amount of loss. See United States v. Galloway, 509 F.3d at 1253. "[T]he district court resolves disputes over the proper amount of restitution by the preponderance of the evidence." Id. "[A] restitution order must be based on the actual amount of loss . . . sustained by a victim as a result of the offense." United States v. Messner, 107 F.3d 1448, 1455 (10th Cir. 1997)(internal quotations omitted).

## ANALYSIS

The Court will overrule the objection as moot because the USPO set forth Youngbear's version of the fight in the Addendum to the PSR. The Court grants Youngbear's other requests. The Court agrees with the parties that a variance is appropriate. The Court also may hold a hearing within 90 days of April 22, 2008 on the amount of restitution and to whom the restitution should be paid.

I.      THE COURT WILL OVERRULE THE OBJECTION TO PARAGRAPH 40 OF THE PSR AS MOOT.

Youngbear, through his attorney, objects to the information contained in paragraph 40 of the PSR related to a guilty plea to a misdemeanor battery. Youngbear requests that the Court excise the language regarding his use of a knife from the PSR because he contends that this information is inaccurate. Youngbear concedes that he pled guilty to battery and that he admitted that he struck Martinez with his fist, but asserts that he did not admit, and that it was never proven, that he had used a knife during the fight with Martinez.

Youngbear's counsel has been provided with a Statement of Probable Cause related to this incident, which indicates that Youngbear made certain statements regarding his involvement in this incident. Youngbear notes that he did not enter a guilty plea related to the use of a weapon and denies ever having used a weapon, despite indications to the contrary in the Statement of Probable Cause. Youngbear maintains that he struck Martinez in self-defense and was able to disarm Martinez; however, Youngbear states that he did not touch Martinez with a knife.

Youngbear represents that his conviction for simple battery set forth in paragraph 40 was a result of a party where several individuals were consuming alcohol. Apparently, there were several witnesses at the party who witnessed the acts; however, there is no indication that any of those witnesses ever came forward to support the more serious allegations against Youngbear. Youngbear contends that he was the initial victim in that situation and had been stabbed by Martinez, who initially brought a knife into the fight.

In its Addendum, the USPO recognizes Youngbear's objection, and has included Youngbear's version of the events that occurred in paragraph 40 of the PSR. By way of the Addendum, Youngbear's version regarding this incident is included in the PSR. There is, however,

support for what Probation has written in paragraph 40.

The USPO derived the information contained in paragraph 40 of the PSR from court records and police records that the USPO obtained from the Ohkay Owingeh Tribal Court and the San Juan Tribal Police Department. The USPO attached copies of these documents for the Court and all parties to review. Accordingly, there is no reason for the Court to take all reference to the knife out of the paragraph. The Court will overrule Youngbear's objection as moot.

## II. THE COURT WILL VARY FROM THE ADVISORY GUIDELINE SENTENCE AND SENTENCE YOUNGBEAR TO 12 MONTHS AND ONE DAY.

The Court will impose a sentence of 12 months and one day on Youngbear. The Court will also require Youngbear to undergo alcohol treatment. Finally, the Court will recommend that the Bureau of Prisons incarcerate Youngbear at FCI, Sheridan, Oregon.

### A. YOUNGBEAR'S HISTORY AND CHARACTERISTICS.

Youngbear's counsel requests that the Court consider the information provided in paragraphs 46 through 49 of the PSR regarding Youngbear's history and characteristics. The Court has carefully reviewed Youngbear's tragic background, and agrees with the parties that a variance is appropriate. Youngbear has received very little help for his alcohol problem. It makes more sense to focus on rehabilitation than punishment in Youngbear's case.

### B. THE COURT WILL REQUIRE YOUNGBEAR TO UNDERGO ALCOHOL TREATMENT.

There is no dispute that most, if not all, of Youngbear's problems, and certainly criminal activity, have been the result of his problems with alcohol. Accordingly, rather than delaying treatment with an 18-month sentence, it makes more sense to begin treatment as soon as possible consistent with the other factors in 18 U.S.C. § 3553(a). The Court will order Youngbear to undergo

alcohol treatment as soon as he is released from custody.

### C. THE COURT WILL RECOMMEND THAT THE BOP INCARCERATE YOUNGBEAR AT FCI SHERIDAN, OREGON.

It may be that Youngbear's period of further incarceration will be so short that the BOP will not move him from the state. Any case, the Court will make the recommendation that he be incarcerated in FCI Sheridan, Oregon. Such a location will put him closer to his family in Montana.

### III. THE COURT MAY SET A FUTURE HEARING ON THE ISSUE OF RESTITUTION.

The parties agreed that, at the time of the April 22, 2008 hearing, the amount of restitution was not ascertainable. Moreover, the USPO agreed that the amount of restitution was not ascertainable. Thus, the Court may set a hearing on the amount of restitution, and to whom the restitution should be paid within, 90 days of April 22, 2008. See 18 U.S.C. § 3664 (stating that, "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.").

**IT IS ORDERED** that the Defendant's Objection is overruled as moot and that the Defendant's requests in his Sentencing Memorandum that the Court impose a sentence of 12 months and one day, order alcohol treatment, and recommend incarceration at FCI Sheridan, Oregon are granted. The Court may set a hearing on the amount of restitution and to whom the restitution should be paid within 90 days of April 22, 2008, because the restitution was not ascertainable at the time of the April 22, 2008 sentencing hearing.

_____
UNITED STATES DISTRICT JUDGE

-13-

*Counsel:*

Gregory J. Fouratt
  United States Attorney for the District of New Mexico
Presiliano Torrez
  Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Michael A. Keefe
  Assistant Federal Public Defender
Albuquerque, New Mexico

    *Attorney for the Defendant*